# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53767-2-II |
| Respondent, | |
| v. | |
| CHRISTOPHER MARTIN HEEREN, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, C.J. — Christopher Heeren appeals his convictions, arguing that (1) the prosecutor committed misconduct by using voir dire to commit jurors to a verdict and by testifying at trial, (2) he received ineffective assistance of counsel because his attorney failed to timely object to the prosecutor's hypothetical questions during voir dire, (3) the trial court erred by denying his motion to dismiss certain jurors for cause, and (4) cumulative errors produced a trial that was fundamentally unfair to him.

We hold that the prosecutor did not commit misconduct; Heeren did not receive ineffective assistance of counsel; the trial court erred in denying Heeren's motion to dismiss certain jurors for cause, but the error did not cause prejudice to Heeren; and cumulative errors did not produce a trial that was fundamentally unfair to Heeren. Accordingly, we affirm Heeren's convictions.

## FACTS

The State charged Heeren with first degree felony murder while armed with a firearm, first degree robbery while armed with a firearm, first degree burglary while armed with a firearm, two counts of first degree unlawful possession of a firearm, first degree trafficking in stolen property,

conspiracy to deliver methamphetamine while armed with a firearm, two counts of theft of a firearm, and possessing a stolen firearm.

Heeren had previously been convicted of first degree robbery, a serious offense, so he was not permitted to possess firearms. The State's theory of the case was that Heeren stole two guns from his half-brother's roommate, sold one, and used the other gun to kill Shaddie Graham, who Heeren then took drugs and money from. These incidents came about in the course of Heeren's attempts to acquire and sell drugs.

A.    VOIR DIRE AND MOTION TO DISMISS JURORS FOR CAUSE

During voir dire, the prosecutor asked a series of questions about circumstantial evidence. The prosecutor started by asking:

> I mean you wouldn't want to take someone with you while you're committing a crime or do it in front of a whole bunch of people. It does happen. Let's be honest about that, but there's a lot of cases that are circumstantial and that you have to put many facts together. Are you all—and I'm not asking this of you about the facts of this case—but are you all okay with that two different kinds of concepts of evidence, and you, as jurors, get to decide how much weight to give them and how much credibility to give them? The judge is going to tell you one is not better than the other. That's your decision as jurors to make that decision. Are you all comfortable with that decision? Is there anyone who feels uncomfortable, if it didn't happen on videotape and there weren't 700 witnesses, I just don't think I could ever make a decision? Does anyone feel that way?

2 Verbatim Report of Proceedings (VRP) (Apr. 16, 2019) at 227-28.

The prosecutor then asked a series of questions based on a hypothetical fact pattern. As the prosecutor added hypothetical facts to the scenario, the prosecutor paused and asked individual jurors what they were thinking. In this hypothetical fact pattern, the prosecutor asked jurors to imagine coming home from work and seeing a white van pull out of their driveway and take off at a high rate of speed. The prosecutor then asked jurors to imagine entering the house, seeing the

back sliding glass door open, and seeing some drawers pulled out in the bedroom.  The prosecutor asked jurors to imagine seeing that their gold jewelry and 70-inch state-of-the-art, brand new TV are missing.  The prosecutor then asked jurors to imagine calling the police and the police pulling over a white van and seeing a 70-inch state-of-the-art, brand new TV in the back.  The prosecutor then added that the serial number from the TV in the white van matched the juror's missing TV.  The prosecutor then asked jurors to imagine the police searching the white van driver and finding gold jewelry in his pockets.  Finally, the prosecutor asked jurors to imagine the driver's brother showing up and saying, "[O]h yeah, my brother is arrested, he has been having a hard time, he doesn't have a job, he has been using drugs, things of that nature.  He actually told me that he was pretty desperate right before this happened."  2 VRP (Apr. 16, 2019) at 237.

During the presentation of serial facts, the prosecutor asked how suspicious the jurors were of the white van and how certain they were that the white van driver was involved in the disappearance of the TV and jewelry.  At the end of the fact pattern, the prosecutor asked the entire venire, "How many people think he is guilty?  Raise your hand if you think he is.  How many people think he is not guilty?  Is there anyone?"  2 VRP (Apr. 16, 2019) at 237-38.  The prosecutor then explained that he had gone through a circumstantial case and asked, "Can you all assure me that you are open to doing something like that, putting little facts together when considering this case?  Is there anyone that feels uncomfortable with that?"  2 VRP (Apr. 16, 2019) at 238.

Heeren's attorney did not object to the prosecutor's hypothetical questions.  During the defense's voir dire, Heeren's attorney reminded the venire about this same hypothetical fact pattern used by the prosecutor.  Heeren's attorney then provided the venire with additional hypothetical facts, like a three-day gap in time between the burglary and the white van being pulled over, as

well as multiple people having access to the van. Heeren's attorney then asked the jurors if they would change their minds about the guilt of the man in the white van. Several jurors indicated that these additional facts would change their minds about the white van driver's guilt or change the way they thought about the hypothetical fact pattern.

At the conclusion of voir dire, Heeren's attorney moved to dismiss certain jurors who would have found the hypothetical white van driver guilty. Heeren's attorney asked the trial court to dismiss for cause jurors 19, 20, 21, 22, 23, 29, 31, 32, 36, 43, 44, 46, 60, 61, 62, 65, 69, 70, 77, 79, 80, and 81. While making this motion, Heeren's attorney apologized for failing to object because he did not see where the line of questions was going to end up. Heeren's attorney argued that the jurors should be removed for cause because of the prosecutor's use of "stakeout" questions and the jurors' responses to the questions.[1] 1 VRP (Apr. 17, 2019) at 87. The prosecutor opposed the motion, arguing that his hypothetical questions were not improper and that the proper remedy would be to dismiss the entire venire. The trial court denied Heeren's motion, stating that it would

> deny the motion in part because it was not objected to at the time. To be honest, I was aware of the potential objection that might have been raised. I am aware of the case law, or at least the general principles regarding getting a jury pool to commit pretrial, pre-evidence. I'm not finding that this violated that, nor am I deciding it—well, I just won't go there. I won't decide this violated that. I think [the prosecutor's] characterization of what he was doing makes it less—far less clear than the principles that I'm familiar with in terms of getting a commitment from a jury pool in a particular set of facts that mirror the facts of the case. I will leave it at that. . . . Motion denied.

1 VRP (Apr. 17, 2019) at 88-89.

---

[1] Heeren's attorney cited a North Carolina death penalty case, *State v. Parks*, to argue that staking out jurors is "an attempt to elicit in advance what a juror's decision will be under a certain set of facts or circumstances." 1 VRP (Apr. 17, 2019) at 86; *see Parks*, 324 N.C. 420, 423, 378 S.E.2d 785 (1989).

The parties then exercised their peremptory challenges. Heeren exercised five of the six peremptory challenges he was entitled to use.

B.      TRIAL

As relevant to this appeal, witnesses testified at trial to the following.

Heeren and his half-brother lived in trailers next to each other on the same property. Heeren's half-brother shared his trailer with a roommate. On September 1, someone stole two firearms belonging to Heeren's half-brother's roommate from his trailer. Law enforcement went to the trailer to investigate the burglary. Law enforcement eventually collected unused and spent ammunition from one of the stolen firearms.

Heeren subsequently sold a gun matching the description of one of the stolen firearms. And later in the month of September, Heeren conspired with several other individuals, including Graham, to acquire and sell drugs, including methamphetamine. After some of Heeren's drug dealing plans fell through, Heeren owed money to someone.

On September 28, Heeren went to Seattle with several other individuals and met up with Graham so they could purchase drugs together. Graham had the money to make the purchase. That evening, Heeren gave one individual $300 to purchase 21 or 22 grams of methamphetamine. This individual did not know whether the money originally came from Heeren or Graham. During the evening, Heeren had a smaller caliber, black, semi-automatic handgun, which matched the description of the other firearm that had been stolen from Heeren's half-brother's roommate.

Graham stayed the night at Heeren's trailer starting in the early morning hours of September 29. In those early morning hours, Heeren texted an acquaintance: "My home boy got close to a oz, he sleeping at my house so i can make sure i have access to it."[2] Trial Ex. 379 at 4.

Later that day, a trail runner found Graham's body with three gunshot wounds at a park near Heeren's trailer. No one witnessed the murder, but two bullets were recovered from Graham's body during the autopsy and a third spent shell casing was found at the scene where Graham's body was found. Using the ammunition recovered from Heeren's half-brother's roommate's trailer, the Washington State Patrol Crime Laboratory determined that the bullets in Graham's body matched the other firearm that had been stolen. Cell phone data showed that Heeren was in or near the park around the time that Graham was killed. The same day that Graham was killed, Heeren paid back the debt he owed after his drug deal fell through.

1.      Puckett Testimony

Rose Puckett, Heeren's half-sister, testified that she and Heeren had exchanged text messages after Graham's death. In these text messages, Heeren implied that Graham may have been killed because Graham had an unpaid debt.

At one point, the prosecutor asked Puckett if she knew police were looking for Heeren on September 30, and she said she knew. The prosecutor then stated, "Now, the police had been over at Johnny Yates's house on the evening of the 30th around six o'clock. Were you made aware of that?" 5 VRP (May 13, 2019) at 886. Puckett responded that she did not believe so. Then the prosecutor said, "Well, that's how the police came to get your name. They got your name from

---

[2] We retain the original spelling, punctuation, and grammar in the quoted text message.

John Yates—." 5 VRP (May 13, 2019) at 886. Before the State could complete its statement, Heeren's counsel objected that it sounded like the prosecutor was testifying. The trial court sustained the objection. The prosecutor then asked Puckett if she had been in contact with John Yates and if the police contacted her on September 30, which Puckett confirmed.

Later in the trial, a law enforcement officer testified that he got Puckett's contact information from John Yates.

2.     Akers Testimony

Rochelle Akers, Heeren's girlfriend, testified that on September 1, the day that Heeren's half-brother's roommate's guns were stolen, she picked up Heeren at around 11:30 a.m. and went with him to a festival. She also testified that she did not see any firearms on Heeren.

During cross-examination, the prosecutor asked if Heeren had ever told Akers that Graham was in trouble and needed his help. Akers responded that Heeren had told her that Graham was in trouble on September 24, before Graham's death, though Heeren did not mention Graham by name. The prosecutor responded, "Okay. Well, we are going to have to listen to your jail phone call about that conversation, because I think you're a little off on that, but we will come back to that." 11 VRP (May 21, 2019) at 2018. Heeren's attorney did not object.

The prosecutor later played a jail phone call recording while Akers was still on the stand.[3] The recording was from a phone call between Akers and Heeren in October, after Heeren had been arrested in connection with Graham's death. After playing part of the recording, the prosecutor asked Akers, "So, Mr. Heeren had never told you that he was in trouble and that he was trying to

---

[3] This recording had already been played for the jury earlier in the trial.

help [Graham] out, correct?" 11 VRP (May 21, 2019) at 2040. Akers responded, "At that time."

11 VRP (May 21, 2019) at 2040. The prosecutor played another part of the recording and asked,

"[Y]ou had never heard from Mr. Heeren that he was trying to help out Mr. Graham, would you

agree with that?" 11 VRP (May 21, 2019) at 2042. Akers responded, "At that time, yeah, I didn't."

11 VRP (May 21, 2019) at 2042.

C.      JURY INSTRUCTIONS, VERDICT, AND SENTENCING

The trial court provided the jury with instructions including one instruction that stated:

> The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.

Clerk's Papers at 36.

The jury found Heeren guilty of all charges. Heeren appeals.

ANALYSIS

A.      PROSECUTORIAL MISCONDUCT

Heeren argues that the prosecutor committed misconduct by using hypothetical questions

to compel jurors to commit to convicting Heeren and by testifying twice at trial. We disagree.

1.      Legal Principles

To prevail on a claim of prosecutorial misconduct, the defendant must show that the

prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278

P.3d 653 (2012). Prejudice is determined under one of two standards of review. *Id.* at 760.

"If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." *Id.* If the defendant did not object to a prosecutor's alleged improper conduct below, any error is waived unless "the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Id.* at 760-61. "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). Our review focuses "less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Id.* at 762.

2.     Hypothetical Questions During Voir Dire

Heeren argues that the prosecutor's conduct during voir dire was improper because he used hypothetical questions to commit jurors to convict Heeren once a certain threshold of circumstantial evidence was presented. We disagree.[4]

---

[4] The heading in Heeren's brief claims that the prosecutor improperly minimized the State's burden of proof by talking about circumstantial evidence, but the substance of the brief argues that the prosecutor improperly committed jurors to a particular vote. Even if we interpret Heeren's brief as arguing that the prosecutor improperly minimized the burden of proof, that argument fails.

Here, the prosecutor used his hypothetical questions to ensure that the jurors were generally comfortable with circumstantial evidence. Immediately before starting his hypothetical questions, the prosecutor stated that the jurors would need to decide how much weight and credibility to give to direct and circumstantial evidence, and that the judge would tell them that "one is not better than the other." 2 VRP (Apr. 16, 2019) at 227. These statements accurately conveyed the jurors' responsibility in weighing direct and circumstantial evidence. *See State v. Sprague*, 16 Wn. App. 2d 213, 233, 480 P.3d 471 (2021). The prosecutor did not tell the jurors how much circumstantial evidence would be necessary to convict Heeren at trial, nor did the prosecutor make any statements about the burden of proof. Therefore, the prosecutor did not minimize the burden of proof.

9

Voir dire should not be used "'to educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law.'" *State v. Frederiksen*, 40 Wn. App. 749, 752, 700 P.2d 369 (quoting *People v. Williams*, 29 Cal.3d 392, 174 Cal.Rptr. 317, 325, 628 P.2d 869 (1981)), *review denied*, 104 Wn.2d 1013 (1985).

It appears that no published Washington case has elaborated on what actions constitute compelling jurors to commit themselves to vote a particular way. However, other states have addressed similar issues and have held that case-specific hypotheticals and commitment questions may be excluded from voir dire.

In Utah, it is improper to use voir dire "as a tool to indoctrinate the jury on a party's argument or bolster anticipated witness testimony." *State v. Williams*, 2018 UT App 96, ¶ 37, 427 P.3d 434. The Court of Appeals of Utah has applied this rule to reverse a conviction where a prosecutor asked questions that were "premised on facts—presented as hypotheticals—that mirrored the actual facts of [the] case." *Id.* at ¶ 39. And in Texas, "[a] question based on facts peculiar to the case on trial may be properly excluded if it requires jurors to commit themselves before hearing the evidence of the case." *DeLeon v. State*, 867 S.W.2d 138, 140 (Tex. App. 1993).

This principle of excluding hypothetical questions only if they include case-specific facts is consistent with the limits of voir dire as expressed in *Frederiksen*. *See* 40 Wn. App. at 752 (voir dire should not be used for educating jurors to the particular facts of the case, compelling jurors to commit themselves to voting a particular way, prejudicing the jury for or against a particular party, arguing the case, indoctrinating the jury, or instructing the jury in matters of law). Thus, parties

do not commit potential jurors to a verdict by presenting hypothetical facts and asking general hypothetical questions without implicating the unique facts of the case.

Here, the prosecutor presented a series of hypothetical facts about a white van driver stealing a TV from a house. Heeren's case, in contrast, was about murder, stolen firearms, and conspiracy to deliver methamphetamine. Although there was a slight factual overlap in a singular question about the alleged perpetrator having a difficult time in life,[5] this vague similarity was not directly related to Heeren's convictions, and the series of hypothetical facts as a whole did not provide details specific to Heeren's case. Because the prosecutor did not implicate the unique facts of Heeren's case in his series of hypothetical facts and questions, it cannot be said that he committed potential jurors to a verdict. Therefore, the prosecutor's hypothetical questions were not improper. Moreover, even Heeren's attorney did not seem to believe the hypothetical questions themselves were improper, as he sought only to dismiss certain jurors based on their individual answers to the hypothetical questions. Had Heeren's counsel thought the questions themselves were improper, he would have sought to dismiss the entire venire.

However, even if we assume the prosecutor's hypothetical facts and questions were improper, they were not so flagrant and ill intentioned that the resulting prejudice could not be cured with a jury instruction. Heeren did not object to the prosecutor's line of hypothetical

---

[5] The hypothetical facts included a white van driver "having a hard time, he doesn't have a job, he has been using drugs, things of that nature. He actually told me that he was pretty desperate right before this happened." 2 VRP (Apr. 16, 2019) at 237. During Heeren's trial, there was testimony that Heeren "had a lot going on" because he lost his job and was having problems with his girlfriend. 2 VRP (May 8, 2019) at 393. Additionally, there was testimony about Heeren using drugs.

questions.[6] And Heeren makes no effort to meet *Emery*'s heightened standard of review. 174 Wn.2d at 760-61.

Here, any resulting prejudice from the prosecutor's series of questions based on hypothetical facts could have been cured with an instruction from the trial court. Had Heeren objected during the prosecutor's presentation of hypothetical facts and if his objection was sustained, the prosecutor could have abandoned the rest of the hypothetical fact pattern and used a different line of questioning to explore the concept of circumstantial evidence. And had Heeren objected after the presentation of hypothetical facts was completed, the trial court could have issued an instruction for the jurors to remain impartial and open minded.

The record shows that an instruction from the trial court to remain impartial and open minded would have been effective. The defense brought up the prosecutor's hypothetical facts again during its own voir dire questioning, added more hypothetical facts to the story, and asked potential jurors if they would change their mind about the guilt of the man in the white van. Several jurors stated that they would or might change their minds when presented with additional facts. The potential jurors' response to further questioning shows that they were open to using additional information to reevaluate the prosecutor's questions, and any resulting prejudice could have been effectively cured through an instruction from the trial court for the jurors to remain impartial and

---

[6] Heeren's briefing implies that he eventually objected to the prosecutor's misconduct. However, Heeren never objected to the line of hypothetical questioning that he now challenges on appeal. Instead, Heeren moved to dismiss certain jurors who responded to the hypothetical by thinking the fictitious white van driver was guilty. Had Heeren objected to the line of hypothetical questioning, he would have sought to dismiss the entire venire, not just individuals who responded in ways he found to be unfavorable.

open minded. Therefore, Heeren has waived any error by failing to object to the prosecutor's presentation of hypothetical facts during voir dire. *See Emery*, 174 Wn.2d at 760-61.

3.      Testifying During Trial

Heeren argues that the prosecutor committed misconduct by twice improperly testifying at trial: once during the direct examination of Puckett and once during the cross-examination of Akers. We disagree.[7]

"It is impermissible for a prosecutor to express a personal opinion as to the credibility of a witness or the guilt of a defendant." *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125 (2014). A prosecutor's expression of personal opinion "violates the advocate-witness rule, which 'prohibits an attorney from appearing as both a witness and an advocate in the same litigation.'" *Id.* (quoting *United States v. Prantil*, 764 F.2d 548, 552-53 (9th Cir. 1985)).

"Improper vouching occurs when the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness." *Thorgerson*, 172 Wn.2d at 443. "'Prejudicial error does not occur until such time as it is *clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a*

---

[7] Heeren argues that the constitutional harmless error standard applies to his claims that the prosecutor testified at trial because the prosecutor's statements violated Heeren's due process rights. But a defendant's burden of establishing prejudice is not altered where the challenged conduct "touched upon the defendant's constitutional rights," and such conduct does not render the prosecutor's comments "per se incurable." *Emery*, 174 Wn.2d at 763. Indeed, "our supreme court has rejected the use of the constitutional harmless error standard in all but the most egregious cases of prosecutorial misconduct, such as when the prosecutor appeals to racial bias or prejudice." *State v. Gouley*, 19 Wn. App. 2d 185, 204, 494 P.3d 458 (2021), *review denied*, No. 100279-3 (Wash. Feb. 2, 2022).

*personal opinion.*'" *State v. McKenzie*, 157 Wn.2d 44, 54, 134 P.3d 221 (2006) (quoting *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59, *review denied*, 100 Wn.2d 1003 (1983)).

"[T]he jury is presumed to follow the instruction that counsel's arguments are not evidence." *State v. Warren*, 165 Wn.2d 17, 29, 195 P.3d 940 (2008), *cert. denied*, 556 U.S. 1192 (2009).

### a. Puckett Direct Examination

During the prosecutor's direct examination of Puckett, the prosecutor said, "Now, the police had been over at Johnny Yates's house on the evening of the 30th around six o'clock. Were you made aware of that?" 5 VRP (May 13, 2019) at 886. Puckett responded that she did not believe so. Then the prosecutor said, "Well, that's how the police came to get your name. They got your name from John Yates—." 5 VRP (May 13, 2019) at 886.

Heeren's counsel objected in the middle of the sentence because it sounded like the prosecutor was testifying. The trial court sustained this objection. The record is unclear as to how the prosecutor's sentence would have ended, and the sentence may have ended in a question. Thus, because it is not clear and unmistakable that the prosecutor was expressing a personal opinion about how the police got Puckett's name or contact information, the prosecutor did not improperly express a personal opinion.

Even if we assume that the prosecutor's statements to Puckett were improper, Heeren fails to show prejudice. Because Heeren objected at trial, he must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. *See Emery*, 174 Wn.2d at 760. But Heeren makes no argument about any prejudice resulting from the prosecutor's statements to Puckett or how that prejudice might have affected the jury's verdict.

14

Regardless, a law enforcement officer later testified at trial that he received Puckett's contact information from John Yates. Further, because jurors are presumed to follow instructions that counsel's arguments are not evidence, and that instruction was given in this case, we presume that the jurors did not consider the prosecutor's statements to Puckett as evidence. *See Warren*, 165 Wn.2d at 29. If the jurors did not consider the prosecutor's statements as evidence, they did not affect the outcome of the case. Therefore, Heeren's argument fails. *See Emery*, 174 Wn.2d at 760.

    b.   Akers Cross-Examination

During his cross-examination of Akers, the prosecutor asked if Heeren told her that Graham was in trouble and needed his help. When Akers responded that Heeren told her that on September 24, before Graham's death, the prosecutor responded, "Okay. Well, we are going to have to listen to your jail phone call about that conversation, because I think you're a little off on that, but we will come back to that." 11 VRP (May 21, 2019) at 2018.

The prosecutor proceeded to play the October jail phone call recording while Akers was on the stand and asked Akers questions throughout the recording about Heeren telling her that Graham was in trouble and needed Heeren's help. Thus, in context, the prosecutor's statement to Akers was not a "clear and unmistakable" expression of personal opinion, but rather an inartful attempt to say that further questioning would be forthcoming. Therefore, the challenged statement was not improper. *See McKenzie*, 157 Wn.2d at 54.

Even assuming the prosecutor's statement was improper, the statement was not so flagrant and ill intentioned that any resulting prejudice could not be cured with a jury instruction. Heeren did not object to the prosecutor's statement at trial, so *Emery*'s heightened standard of review applies. *See* 174 Wn.2d at 760-61.

The statement was not flagrant or ill intentioned, as it directed the jurors' attention to a piece of evidence that had already been heard and was preceded with "I think." 11 VRP (May 21, 2019) at 2018. The record shows no reason to believe that the prosecutor had ill intentions or was flagrantly asserting his personal opinion.

Additionally, any resulting prejudice could have been cured with a jury instruction had Heeren objected at the time. If Heeren had objected, the trial court could have instructed jurors to disregard the prosecutor's statement and reminded jurors that statements from the attorneys are not evidence. Because any resulting prejudice could have been cured with an instruction from the trial court, Heeren has waived any alleged error. *See Emery*, 174 Wn.2d at 760-61. Therefore, Heeren's argument fails.

B.      INEFFECTIVE ASSISTANCE OF COUNSEL

Heeren argues that he received ineffective assistance of counsel because his attorney failed to timely object to the prosecutor's hypothetical questions during voir dire. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a defendant the right to effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011), *cert. denied*, 574 U.S. 860 (2014). We review ineffective assistance of counsel claims de novo. *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018). A defendant claiming ineffective assistance of counsel has the burden to establish that counsel's performance was deficient and that the performance prejudiced the defendant's case. *Grier*, 171 Wn.2d at 32-33. Failure to establish either prong is fatal to an ineffective assistance of counsel claim. *Id*.

16

Counsel's performance is deficient if it falls "'below an objective standard of reasonableness.'" *Grier*, 171 Wn.2d at 33 (quoting *Strickland v. Washington*, 466 U.S. 668, 669, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). "There is a strong presumption that counsel's performance was reasonable." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). A defendant may overcome this presumption by showing that "'there is no conceivable legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). However, if counsel's conduct can be characterized as a legitimate trial strategy or tactic, then counsel's performance is not deficient. *Id.*

To establish prejudice, the defendant must "prove that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *Kyllo*, 166 Wn.2d at 862. For ineffective assistance of counsel claims based on an attorney's failure to object, the defendant "'must establish that an objection likely would have been sustained.'" *State v. Case*, 13 Wn. App. 2d 657, 673, 466 P.3d 799 (2020) (quoting *In re Det. of Monroe*, 198 Wn. App. 196, 205, 392 P.3d 1088 (2017)).

Here, Heeren's counsel did not object to the prosecutor's hypothetical facts and questions during voir dire. Instead, Heeren's counsel questioned jurors on the same set of hypothetical facts and added hypothetical facts of his own to see if the jurors would change their minds. Heeren's counsel later moved to dismiss certain jurors for cause based on the jurors' answers to the prosecutor's hypothetical questions. Heeren's counsel did apologize for not objecting, saying he did not know where the questioning would end up. This statement shows that Heeren's counsel made a tactical decision to not object at the time of the State's presentation of hypothetical facts questioning because he did not know where the questions would lead. This is a legitimate trial

17

strategy. Also, Heeren's counsel used the prosecutor's hypothetical question strategy by building upon the prosecutor's hypothetical facts to lead the potential jurors to see that additional facts may change previous positions. Because the choice not to object could be characterized as a legitimate trial strategy or tactic, Heeren's counsel's performance was not deficient.[8] *See Grier*, 171 Wn.2d at 33. Therefore, Heeren's effective assistance of counsel claim fails.

C.     DENIAL OF MOTION TO DISMISS JURORS

Heeren argues that the trial court erred by denying his motion to dismiss certain jurors. Specifically, Heeren argues that the trial court erred by denying the motion based on the defense's failure to timely object and by refusing to reach the merits of the motion. We hold that the trial court erred, but the error did not substantially prejudice Heeren.

The scope of voir dire is within the trial court's discretion. *Frederiksen*, 40 Wn. App. at 752.[9] We do not disturb a trial court's ruling regarding the scope of voir dire "[a]bsent an abuse of discretion and a showing that the accused's rights have been substantially prejudiced thereby."

---

[8]  Though not necessary, we note that this claim also fails on the prejudice prong. Even if Heeren's counsel had objected to the hypothetical facts and questions, the trial court implied that it would not have sustained the objection by stating that the prosecutor's hypothetical questions were "far less clear than the principles that I'm familiar with in terms of getting a commitment from a jury pool in a particular set of facts that mirror the facts of the case." 1 VRP (Apr. 17, 2019) at 88-89. Thus, the record indicates that the trial court would have denied the motion on the merits. For these reasons, Heeren cannot show that an objection from his counsel would likely have been successful. Therefore, Heeren fails to show that there is a reasonable probability that, if his attorney would have objected, the outcome of the proceedings would have been different. *See Case*, 13 Wn. App. 2d at 673.

[9]  While Heeren's motion pertained to the dismissal of certain jurors for cause, he argued that the trial court should grant his motion based on the scope of voir dire, specifically the prosecutor's series of hypothetical questions. Therefore, the legal standards regarding the scope of voir dire apply to our review of the trial court's decision to deny Heeren's motion.

*Id*. at 752–53. A trial court abuses its discretion when its decision is based on untenable grounds or reasons. *State v. Depaz*, 165 Wn.2d 842, 852, 204 P.3d 217 (2009). To prove prejudice, a defendant must show that he exhausted his peremptory challenges. *State v. Elmore*, 139 Wn.2d 250, 277-78, 985 P.2d 289 (1999), *cert. denied*, 531 U.S. 837 (2000).

Here, Heeren moved to dismiss several jurors for cause based on the prosecutor's line of hypothetical questioning and the way these jurors responded to the questioning. The trial court denied Heeren's motion to dismiss the jurors "because it was not objected to at the time." 1 VRP (Apr. 17, 2019) at 88. But Heeren made the motion before peremptory challenges had been exercised and before the jurors were empaneled, so the motion was timely. *See Depaz*, 165 Wn.2d at 858. Therefore, the trial court abused its discretion by denying the motion for an untenable reason, untimeliness.

However, Heeren has not shown that his rights were substantially prejudiced by the trial court's denial of his motion. *See Frederiksen*, 40 Wn. App. at 752-53. Heeren made the motion and argued that certain jurors should be dismissed because of the prosecutor's use of improper hypothetical questions. But as discussed above, the prosecutor's hypothetical questions were not improper. Therefore, the trial court's decision to deny the motion did not prejudice Heeren's rights.

Also, Heeren argued that certain jurors must be dismissed based on their answers to the prosecutor's hypothetical questioning. Despite challenging more than six jurors, Heeren did not exercise all his peremptory challenges. Heeren was entitled to six peremptory challenges and only used five, so he has not shown that he exhausted his peremptory challenges. Therefore, Heeren has failed to show that the trial court's denial of his motion prejudiced his rights, substantially or

otherwise. *See Elmore*, 139 Wn.2d at 277-78. Accordingly, we do not disturb the trial court's decision to deny Heeren's motion.

D.      CUMULATIVE ERROR

Heeren argues that the cumulative effect of multiple instances of prosecutorial misconduct deprived Heeren of his due process right to a fair trial. We disagree.

"Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *Emery*, 174 Wn.2d at 766. This doctrine does not apply when the defendant fails to establish how the claimed trial errors affected the outcome of the trial or how combined errors affected the outcome of the trial. *Thorgerson*, 172 Wn.2d at 454.

Here, Heeren has shown only one trial error, the trial court's denial of his motion to dismiss certain jurors for cause. But as discussed above, the error did not prejudice Heeren because the prosecutor's hypothetical questions, which were the basis for his motion, were not improper. Further, Heeren failed to show prejudice because he did not exhaust his peremptory challenges. Because Heeren has failed to establish how his claimed trial error affected the outcome of his trial, Heeren's cumulative error argument fails. *See Thorgerson*, 172 Wn.2d at 454.

We affirm Heeren's convictions.

No. 53767-2-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____ , C.J.
Lee, C.J.

We concur:

_____
Glasgow, J.

_____
Veljacic, J.