

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 40056-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN G. SCHILLING, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — John Schilling was charged with rape of a child in the first degree, indecent exposure, and two counts of child molestation in the first degree for allegedly sexually abusing his step-daughter, Madison.[1]  Following trial, a jury found Mr. Schilling guilty of indecent exposure and both counts of child molestation in the first degree.  The

---

[1] To protect the privacy interests of Madison, we use a pseudonym throughout this opinion.  Gen. Order of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses*, (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2012_001&div=III

jury was unable to reach a unanimous verdict on the rape of a child in the first degree charge.

Mr. Schilling appeals, arguing (1) hearsay was improperly admitted, (2) his trial counsel was ineffective, (3) the prosecutor committed prejudicial misconduct, (4) cumulative error deprived him of a fair trial, (5) insufficient evidence was presented to sustain a conviction for indecent exposure, and (6) certain community custody conditions were impermissibly ordered.

We disagree that Mr. Schilling received ineffective assistance from his trial counsel. We agree the court erred in allowing inadmissible hearsay, the prosecutor committed prejudicial misconduct, cumulative error deprived Mr. Schilling of a fair trial, and the evidence was insufficient to support a conviction for indecent exposure. We reverse the child molestation in the first degree convictions without prejudice and remand for a new trial, reverse the indecent exposure conviction and dismiss with prejudice, and decline to address the challenged conditions of community custody.

## BACKGROUND

Mr. Schilling and Amanda Czerwinski[2] were married from 2011 until 2019. In addition to having four children in common, Amanda had three children from prior

---

[2] Amanda Czerwinski and Sara Czerwinski are referred to by their first names for clarity. No disrespect is intended.

2

relationships, T.A., Madison, and J.C.  In 2019, Child Protective Services (CPS) became involved with the family.  Mr. Schilling was sporadically living with the family at the time.  In late August 2019, all of the children, aside from T.A. who was an adult, were placed in out-of-home care.  Madison was placed with her aunt, Sara Czerwinski, who later adopted her.  Two of Amanda and Mr. Schilling's other biological children also resided with Sara.

In 2022, Mr. Schilling began supervised visitation with his four biological children, including the two that lived with Sara.  After Mr. Schilling's visitation commenced, Kayla Graham, T.A.'s wife, told Sara she was concerned about Mr. Schilling having contact with his biological children.  Ms. Graham's concerns were based on prior comments Amanda had made to her regarding Madison.  In response to Ms. Graham's concerns, Sara asked Madison if she had any "concerns" about Mr. Schilling having contact with his children.  Rep. of Proc. (RP) at 259, 284.  Sara received a "very emotional" response from Madison who disclosed that Mr. Schilling had previously sexually abused her.  RP at 259.  Sara, in turn, made reports to CPS and law enforcement.  Based on Madison's disclosures, Mr. Schilling was charged with rape of a child in the first degree, two counts of child molestation in the first degree, and indecent exposure.

Prior to trial, there was discussion over whether Madison's disclosure to Sara was admissible:

[THE STATE]: Your Honor—I guess I'm—I'm just going to—have to say that I think that the state's position that they will be attacking this girl's credibility and the fact of that household and CPS involvement and drugs and alcohol, and prison, all formed the reason and a basis for why she acted the way she did, what she said, when she said, particularly if—if what I see from counsel's statements and the case law presented was, "Well, this was a late disclosure," and "She is only doing this [because she's been coached.]"

. . . .

[DEFENSE COUNSEL]: So, all I know is what [Madison] told Det. Shull—in two different statements. Okay? She said, "[Mr. Schilling] molested me in the bedroom," "I went out and told my mom, she basically (inaudible). So when he molested me again I didn't tell her, 'cause she didn't do anything the first time." Okay?

"The next time I told anybody was October of 2022 when I told my aunt Sara, and my specific reason for disclosing to my aunt Sara was I had heard that [Mr. Schilling] is trying to get visitation rights back with my younger siblings and I wanted to protect them."

So, her statement, her testimony that she told her mom [obviously comes in as evidence.]

THE COURT: Right.

[DEFENSE COUNSEL]: I believe that the statement to Aunt Sara on October 22nd, 2022 comes in in a very limited way, under the Murley decision, under the hue and cry. As I understand that rule—and it's been affirmed more recently than 1947—the state is allowed to show that a disclosure was made without stating what the disclosure was or even who the alleged perpetrator was, under the hue and cry rule. So I would have no problem with Aunt Sara being allowed to testify, "On October 22nd while she's sitting in the back of my car she made a disclosure to me about sex—bad things that had happened to her." No further than that. "And then so I reported it to the police."—And that's—that's why we're here today.

RP at 42-44.

The court responded that Madison "gets to say, 'I—I—I spoke to my mom, then I didn't—didn't tell her the second time, and then I did tell my—my aunt, and this is why I did.'" RP at 45. Defense counsel agreed and added Madison could say, "'Yeah, I went—Yeah, I talked to the—I talked to the police,' too. But what can't come in is the substance of any of those prior statements." RP at 45.

The defense also sought to exclude testimony from Ms. Graham and T.A. about statements Madison made to her mother, Amanda, that were then repeated to Ms. Graham and T.A. The reiterated statement was that Mr. Schilling "touched her down there or touched her privates." RP at 67.

Defense counsel argued the statements Amanda made to Ms. Graham and T.A. regarding Madison's disclosure were double hearsay and should not be admitted. The State argued it was not offering T.A.'s and Ms. Graham's testimonies to "say 'This is what Amanda told us at this point in time, and you need to believe that that is true, that she said that.'" RP at 68. Instead, the State sought to admit the testimony to explain what prompted Ms. Graham to "reach[ ] out to Sara, . . . which motivates a conversation with [Madison], that leads to law enforcement [involvement]." RP at 71-72. Thus, the State's position was that T.A.'s and Ms. Graham's testimonies were not hearsay.

The court agreed with defense counsel that "the substance of [Madison's] conversation to Amanda cannot come out . . . other than—he the general nature of what [Ms. Graham] did as a result of having been told it." RP at 69. Ultimately, the court

ruled it would not allow testimony about the actual statements that were made but would allow testimony about "the fact that [Ms. Graham] then says something to Sara and then Sara says something—to [Madison] and [Madison] makes the disclosure . . . not exactly what was said, but the fact that [Madison] makes a disclosure 'cause [Madison] is supposedly going to testify to that." RP at 77. The court reasoned, "the fact that something was said that led them to make another move, or led them to do something—would not be—testifying to what was said for the truth of the matter asserted." RP at 76.

After the jury was empaneled, the State presented its opening statement.[3] In part, the prosecutor commented:

> So in some regards, what it will ultimately boil down to is whether or not you believe what [Madison] says happened. And we talked about that as well, and how that can be tough. But I think you will have the opportunity to watch her. You'll have the opportunity to listen to her. You'll have the opportunity to put what she says in context. And when you do that, I think that you will find that what she is telling you is credible.
>
> And when I come back at the end of closing arguments, I will ask you to find him guilty on four counts.

RP at 220.

During Mr. Schilling's opening statement, defense counsel highlighted that a lot of time had passed between when Madison was allegedly abused by Mr. Schilling and when she disclosed the abuse. He also pointed out that Madison was unsure about some of the

---

[3] Relevant facts related to voir dire are including in the analysis below.

6

facts surrounding the incidents in which she alleged Mr. Schilling abused her and posited

that "perhaps she dreamt it or perhaps it did happen" but it may have been someone other

than Mr. Schilling.  RP at 226.

The State called Madison, Sara, Amanda, T.A., Ms. Graham, Detective Ryan

Shull, and Corrections Officer Aaron Avey as witnesses at trial.  Mr. Schilling testified in

his own defense.

*Madison's Testimony*

Madison testified that Mr. Schilling sexually abused her on three occasions.  The

first incident occurred when Madison was sleeping in her bedroom.  She testified Mr.

Schilling came into her bedroom and touched her "inside" her vagina.  RP at 424.  She

stated she saw the culprit leave after the touching stopped, and she was "80 percent" sure

it was Mr. Schilling. [4]  RP at 425.

Madison testified that the second incident occurred at a grocery store called the

"18th Street Deli."  RP at 427.  Madison testified she walked into the restroom at the

store, followed by Mr. Schilling.  She claimed it was not normal for Mr. Schilling to enter

the restroom with her.   Madison testified Mr. Schilling put his hand down the front of

her shorts while in the restroom and began touching her vagina.  Madison told Mr.

---

[4] Mr. Schilling was charged with rape of a child in the first degree for this incident.

7

Schilling to "[s]top," and he did. RP at 407. Mr. Schilling then "went to the bathroom in front" of Madison. RP at 408. Madison testified she was "there and seeing him do this." RP at 408. Madison verified she was going into the fifth grade when this incident occurred and was about 10 years old. [5]

As for the third incident, Madison testified that she was sitting on a bedroom floor using her phone when Mr. Schilling walked in and sat beside her. Mr. Schilling then began to "rub [Madison's] vagina over [her] pants." RP at 398. She testified Mr. Schilling stopped touching her because she got up and walked to her mother's room. Madison reported what had occurred to Amanda. [6]

Finally, Madison testified she likely would not have disclosed the abuse to Sara had Sara not asked her if she had concerns about her half-siblings having contact with Mr. Schilling.

*Sara's Testimony*

Sara testified that Madison and two of her half-siblings moved in with her in 2019. In 2022, after Mr. Schilling began having contact with his biological children, Ms. Graham told Sara that "she was concerned about visitations with the children and [Mr.

---

[5] Mr. Schilling was charged with child molestation in the first degree and indecent exposure for this incident.

[6] Mr. Schilling was charged with child molestation in the first degree for this incident.

Schilling] being with the children." RP at 258. In turn, Sara asked Madison if she had concerns about Mr. Schilling having contact with his children that elicited a "very emotional" response from Madison. RP at 259. Sara testified that Madison shared information with her that caused her "concern," so she made reports to CPS and law enforcement. RP at 259.

*T.A.'s Testimony*

T.A. testified that Amanda shared "concerns" with him about Madison, when he was residing with her in 2019. RP at 332. The State asked, "and you can tell me whether this is fair or not—but that she had indicated a concern that [Madison] had expressed to her about inappropriate contact by [Mr. Schilling?]" RP at 332. T.A. replied, "Yes." *Id*. Defense counsel noted his standing objection to this testimony.

*Ms. Graham's Testimony*

Ms. Graham testified that Amanda made a statement to her in approximately 2019 that caused her concern. She testified that T.A. was present when the statement was made. The State asked Ms. Graham, "would it be a fair characterization that—what was shared with you was [Amanda] expressing that [Madison] told her of inappropriate touching by [Mr. Schilling?]" RP at 363. Ms. Graham responded, "Yes." *Id*. Ms. Graham testified that at the time she "mostly just put [the conversation] out of [her] mind." *Id*. However, when she found out Mr. Schilling was having contact with his biological children again, she told Sara about what Amanda had previously told her.

9

*Amanda's Testimony*

Amanda confirmed that Madison "came out of the room and said 'Daddy touched me.'" RP at 473. She also testified that she "freaked out and . . . told [T.A.] and [Ms. Graham] what I thought." RP at 473. She recalled she "freaked out" because "your child comes to you and says, you know, someone's touched them, being a mother that loves her children more than anything in this world, I was going to kill 'em. I'd have flat out— I was going to kill him, if that's what he did." RP at 475. When Amanda asked Mr. Schilling about the incident, he told her Madison had "peed her pants and had a rash," and he was simply trying to change her clothes and wash her. RP at 476-77. Amanda testified it was common for Mr. Schilling "to change [Madison]" and that Madison frequently got rashes. RP at 477. Amanda largely expressed that she did not believe Mr. Schilling touched Madison inappropriately. In regard to the 18th Street Deli incident, Amanda testified that "well, he explained to me he wasn't going to leave her outside of the bathroom. And I didn't think a big deal of it. —sits down to pee. I mean, so—I'm just saying." RP at 482. She also testified, "there's no way in heck [Mr. Schilling] would have touched [Madison]." RP at 490.

Amanda further testified that in 2019 "[the State] took my kids and I have not been able to talk to my kids since." RP at 480. Amanda claimed she had not talked to Mr. Schilling "in almost three years" due to "a no-contact order." RP at 487. She also claimed that "since the department decided to remove my children from my care, I

haven't been contactable . . . 'cause I don't trust you guys." RP at 488. Amanda testified

that Detective Shull had called and left messages but indicated she had not talked to him

about the investigation.

*Detective Shull's Testimony*

Following Amanda's testimony, the State sought to call Detective Shull to testify

that Amanda had recently been in contact with Mr. Schilling, contrary to her testimony.

The State indicated that "Det. Shull . . . would be able to show that [Amanda] perjured

herself . . . I think its impeachment on a collateral matter. I'm not sure it's relevant."

RP at 495. Defense counsel responded, "[w]ell it goes directly to her credibility. If she

stands on—she's on the witness stand lying, that has everything to do with her

credibility." RP at 495. The court allowed Detective Shull to testify.

Detective Shull testified that he had unsuccessfully tried to contact Amanda during

the pendency of the investigation. Detective Shull was able to interview Amanda the day

prior to his testimony. Detective Shull obtained a phone number from Amanda during

the interview and was able "to do some research into phone calls." RP at 505. Through

this research, Detective Shull discovered Amanda had "quite a number of contacts with

[Mr. Schilling]" going back to "August 15, 2023." RP at 506.

On cross-examination, defense counsel elicited testimony from Detective Shull

that none of communications between Amanda and Mr. Schilling indicated Mr. Schilling

11

was "coaching her to say anything in particular." RP at 508. Detective Shull also acknowledged the two were in a prior long-term relationship.

*Mr. Schilling's Testimony*

Mr. Schilling testified that he did not touch Madison inappropriately and that, during the incident Madison disclosed to Amanda, he was "massaging her legs, because she's [sic] leg cramps a lot, I noticed that she needed to change her clothing. So I proceeded helping in doing so." RP at 519. In regard to the 18th Street Deli incident, Mr. Schilling testified that he went into the restroom with Madison because he too had to use the restroom, and he "didn't want to leave her outside." RP at 520. He testified she was between 10 and 12 years old at the time. Mr. Schilling said he "[w]ent in, used the bathroom, and we left" and that he "always sit[s]" when he urinates. RP at 521. He wholly denied inserting his fingers into her vagina while she slept.

*Closing Arguments*

During summation, the prosecutor reminded the jury that the case "was going to boil down to the testimony [it] heard on the stand." RP at 557. The prosecutor also referenced voir dire stating, "I'd like to talk about the fact that as we were discussing things in voir dire, I asked if we needed to have perfect witnesses, and no one thought we needed to have perfect witnesses. I asked if testimony alone was sufficient, and everyone agreed that would be fine." RP at 557.

The prosecutor also referenced Amanda's earlier impeachment:

> Does [Amanda]—have any demonstrated problem with credibility. Well, I think she perjured herself on the stand, quite honestly, because she said, "I have not had contact with Mr. Schilling for over three years." Well, we put Det. Shull—the phone number she provided the day before. She'd been having contact with him on that phone back to August. She had contact with him within minutes after the interview with Det. Shull. "No contact, not in the last three years, no way. Haven't talked to him once about any of these things." No[w], we don't know if they did or didn't. I think—I think Det. Shull was asked, "Was there evidence of coaching," he said,—not in what he saw. But were they talking? Absolutely.

> Did [Amanda] commit perjury when she swore to tell the truth, the whole truth, nothing but the truth then got up there and lied? Yeah. That is definitely something you can consider about her credibility.

RP at 575-76.

Defense counsel, in his closing argument, argued generally that Madison's testimony did not demonstrate Mr. Schilling committed the offenses beyond a reasonable doubt. He highlighted Madison's testimony that she thought the incident in which she was asleep "'probably was a dream'" and that she was only "'80 percent sure'" Mr. Schilling was the person who inappropriately touched her during this incident. RP at 583. Defense counsel argued:

> I'm not a Hollywood screenwriter, unlike Law and Order or Perry Mason back in the Stone Ages, the witness is never going to recount [sic] on the stand, and I'm never going to be able to show why a child lied if she lied intentionally.

> And I don't know that [Madison] lied intentionally, okay? I don't have to prove that she lied intentionally. They have to prove that she's telling the truth. And she does—her testimony has to be judged by the same standard of any other witness.

RP at 587.

13

During the State's rebuttal to Mr. Schilling's closing argument, the prosecutor

began by expressing:

> Wow. Wow. I think maybe he could be a screenwriter, 'cause what he just
> told you was utter fiction. Did you hear any of that from that witness stand?

> He starts, 'You have to hold every single word against this child,' and she
> has to be held to the same account, but then ends it with, 'I'm not a
> screenwriter for Hollywood, but let me plant another idea in your head that
> there's no evidence to support whatsoever, and I want you to consider that
> and come up with reasonable doubt based on nothing you heard in the
> courtroom, but what I just came up with for the next movie I'm writing for
> Hollywood.'

RP at 590-91. The prosecutor later referred to defense counsel's argument as "this latest

Hollywood rendition." RP at 593. The prosecutor concluded its rebuttal argument by

stating:

> And you judge the credibility of the witnesses. And when you do that—and
> ignore the last—I think I had like a page and a half of notes on this fantastic
> story—ignore that altogether, 'cause there was no testimony along that—
> And fill out those forms guilty, all four.

RP at 594.

Ultimately, the jury found Mr. Schilling guilty of indecent exposure and both

counts of child molestation in the first degree. The jury was unable to reach a unanimous

verdict on the charge of rape of a child in the first degree.

Mr. Schilling was later sentenced on the child molestation in the first degree

charges to 180 months to life of confinement and a lifetime of community custody.

Mr. Schilling timely appeals.

14

ANALYSIS

ADMISSION OF HEARSAY

Mr. Schilling argues the court erred in admitting hearsay through Ms. Graham and T.A. The State responds that the statements were not hearsay and, if they were, an exception to the hearsay rule applied. We agree the trial court erred in allowing the introduction of inadmissible hearsay.

"Hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay is not admissible unless an exception or exclusion applies. ER 802. "Whether a statement is hearsay depends upon the purpose for which the statement is offered." *State v. Crowder*, 103 Wn. App. 20, 26, 11 P.3d 828 (2000). A statement is not hearsay if it is offered to show the declarant's state of mind. *State v. Johnson*, 61 Wn. App. 235, 241, 809 P.2d 764 (1991), *aff'd*, 119 Wn.2d 167, 829 P.2d 1082 (1992). Additionally, an out-of-court statement is not hearsay if it is offered to show the effect on the listener, regardless of the truth of the statement. *State v. Edwards*, 131 Wn. App. 611, 614, 128 P.3d 631 (2006). In determining whether the statement is offered to prove its truth, the court should consider whether the benign purpose is relevant. *State v. Gonzalez-Gonzalez*, 193 Wn. App. 683, 690, 370 P.3d 989 (2016). We review de novo whether or not a statement is hearsay. *State v. Hudlow*, 182 Wn. App. 266, 281, 331 P.3d 90 (2014).

Here, the State sought to introduce evidence through the testimony of T.A. and

Ms. Graham that when they were visiting Amanda, she came out of the bathroom very

upset and told T.A. and Ms. Graham that Madison had told her (Amanda) earlier that day

that Mr. Schilling had touched her (Madison's) private parts. Mr. Schilling's attorney

moved in limine to prohibit T.A. and Ms. Graham from testifying about Amanda's

statement, arguing it amounted to double hearsay. Defense counsel conceded that

Amanda could testify about Madison's statement. In response, the State argued it was

not offering T.A.'s and Ms. Graham's testimonies to "say 'This is what Amanda told us

at this point in time, and you need to believe that that is true, that she said that.'" RP at

68. Instead, the State sought to admit the testimony:

> Because it also relates to down the road, [Ms. Graham] is the one who then reaches out to [Sara], which motivates a conversation . . . that leads to law enforcement. And so her basis for reaching out to her at that point in time is based upon the prior interaction with Amanda . . .

> So, it's not that the state is trying to say that what Amanda said was true. We don't even necessarily go into detail other than to say she talked about Mr. Schilling having an inappropriate contact. "What did you do based upon that." "Nothing." Which then leads into down the road, "Okay,—why at this point in time did you take this action." It's tied together, not so much that the statement by Amanda is true, or that it happened, but there was a conversation that was in short order from when [Madison] spoke to her mom—

RP at 71-72. Thus, the State's position was that T.A.'s and Ms. Graham's testimonies

were not hearsay.

16

The court agreed with defense counsel that "the substance of [Madison's] conversation with Amanda cannot come out . . . other than . . . the general nature of it and what [Ms. Graham] did as a result of having been told it." RP at 69. The court ruled it would:

> [N]ot allow any actual statements to be made, because those are hearsay statements. But, the fact that [Ms. Graham] then says something to Sara and then Sara says something—to [Madison] and [Madison] makes the disclosure, all of that's going to be coming in—not exactly what was said, but the fact that [Madison] makes a disclosure 'cause [Madison] is supposedly going to testify to that.

RP at 77. The court reasoned:

> [Ms. Graham] is allowed to say, "What did you"—if asked if she had anything more to do with it she would be allowed to say, "Well, because of a comment that Amanda told me"—And you would not be allowed to say what [Amanda] told her—"I went ahead and warned—Sara not to let"— that—that there was a—issue with [Madison]. And then Sara would say, "Because of that then I talked to [Madison]." But I mean, you wouldn't be allowed to say what the hearsay is, but the fact that something was said that led them to make another move, or led them to do something—would not be—testifying to what was said for the truth of the matter asserted.

RP at 75-76.

During a later discussion, the prosecutor summarized his understanding of the court's ruling, indicating he believed T.A. and Ms. Graham would be allowed to say that Amanda was "freaking out" and said Mr. Schilling had done something inappropriate to Madison. RP at 202. The court affirmed that T.A. and Ms. Graham could testify that Amanda was "freaking out" about Mr. Schilling and some kind of inappropriate contact

17

with Madison, but could not repeat any statements by Madison, noting the nonhearsay was relevant to show actions that Ms. Graham later took. RP at 205. Defense counsel continued to object, arguing that even if it was limited in this way, the court was allowing Amanda's hearsay statement to be indirectly admitted.

During direct examination, the State asked T.A. whether Amanda was upset about a conversation she (Amanda) had earlier with Madison and then asked whether Amanda "indicated a concern that [Madison] had expressed to her about inappropriate contact by [Mr. Schilling]." RP at 332. Over defense counsel's standing objection, T.A. responded "Yes." RP at 332. Similarly, in questioning Ms. Graham, the prosecutor asked, "would it be a fair characterization that—what was shared with you was [Amanda] expressing that [Madison] told her of inappropriate touching by [Mr. Schilling]?" RP at 363. Ms. Graham responded in the affirmative.

Ms. Graham further testified that she found out Mr. Schilling was having visitation with his biological children in approximately 2022 that concerned her given Amanda's prior statements. In response, Ms. Graham relayed the information Amanda had previously shared with her to Sara who then asked Madison about whether Mr. Schilling had ever had inappropriate contact with her.

Mr. Schilling argues Ms. Graham's and T.A.'s statements were hearsay and should not have been admitted. We disagree that the court's original ruling allowed for the admission of hearsay as Ms. Graham's testimony was not intended to prove the truth

18

of the statements—that Mr. Schilling molested Madison—but was instead intended to show the effect on Ms. Graham and what she did in response to Amanda's comment. The same cannot be said of T.A.'s similar testimony. There was no evidence that T.A. did anything in response to Amanda's comment. Nor was T.A.'s state of mind relevant. When the benign purpose of introducing an out-of-court assertion is irrelevant, the statement is hearsay. *Gonzalez-Gonzalez*, 193 Wn. App. at 690. We further conclude the court's later expansion of its ruling, suggesting that the witnesses could testify that Amanda's comment referenced inappropriate touching, was an abuse of discretion as it allowed for the introduction of inadmissible hearsay.

The State elicited testimony from Ms. Graham that went beyond Ms. Graham stating she had contacted Sara based on information received from Amanda. Instead, the court allowed Ms. Graham to summarize the contents of Amanda's statement, including Madison's accusation of inappropriate touching by Mr. Schilling. The contents of Amanda's statement to T.A. and Ms. Graham was relevant only if it was true. This becomes apparent during summation when the prosecutor used the testimony of T.A. and Ms. Graham as substantive evidence of the truth of Madison's statement. The prosecutor argued that "[Amanda] also indicates, as confirmed by [T.A. and Ms. Graham], that [Madison] did tell her that [Mr. Schilling] had touched her in an inappropriate fashion." RP at 562. Later, the prosecutor confirmed, "But that's four people who indicate that

19

young girl told mom on that night," and "seems fairly consistent evidence across all four individuals." RP at 562-63.

The State elicited, with the trial court's approval, testimony that went beyond establishing that T.A. or Ms. Graham acted on information provided by Amanda. The testimonies of T.A. and Ms. Graham connected Mr. Schilling to the crime when they testified that Amanda expressed to them that Madison told her of inappropriate touching by Mr. Schilling. This testimony is inadmissible hearsay. The court abused its discretion in allowing the admission of the testimony.[7]

Having concluded that the court erred in allowing inadmissible hearsay, we apply a harmless error analysis. *State v. Templeton*, 148 Wn.2d 193, 200, 59 P.3d 632 (2002). A nonconstitutional error "requires reversal only if there is a reasonable probability that the error materially affected the outcome of the trial." *State v. Kindell*, 181 Wn. App. 844, 853-54, 326 P.3d 876 (2014). The defendant carries the burden of demonstrating

---

[7] The State posits that even if Ms. Graham's and T.A.'s testimonies were hearsay, the excited utterance exception applies. A statement is an excited utterance if "the statement relates to 'a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.'" *State v. Woods*, 143 Wn.2d 561, 597, 23 P.3d 1046 (2001) (quoting ER 803(a)(2)). Here, even if Madison's disclosure to Amanda was an excited utterance, Amanda's statement to Ms. Graham and T.A. was not because it was not made while she was still under the influence of the startling event. Instead, testimony at trial demonstrated Madison made her disclosure to Amanda in the morning immediately after she was molested but Amanda did not repeat Madison's disclosure to Ms. Graham and T.A. until later that evening. Thus, the statements would not fall into the excited utterance exception to hearsay.

nonconstitutional harmless error. *State v. Barry*, 183 Wn.2d 297, 317-18, 352 P.3d 161 (2015).

Here, there is not a reasonable probability that the error materially affected the outcome of the trial. The inadmissible hearsay was minimal and cumulative of Madison's properly admitted testimony.

INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Schilling argues his counsel was ineffective for conceding that Sara could testify about Madison's disclosures to her and in failing to object to the State's impeachment of Amanda, via Detective Shull, regarding when she last had contact with Mr. Schilling. We disagree Mr. Schilling's trial counsel was ineffective.

Defendants have a constitutionally guaranteed right to effective assistance of counsel. U.S. CONST. AMEND. VI; WASH. CONST. art. I, § 22; *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018). A claim of ineffective assistance of counsel is an issue of constitutional magnitude that may be considered for the first time on appeal. *State v. Nichols*, 161 Wn.2d 1, 9, 162 P.3d 1122 (2007). Ineffective assistance of counsel claims are reviewed de novo. *State v. White*, 80 Wn. App. 406, 410, 907 P.2d 310 (1995).

The defendant bears the burden of showing (1) that his counsel's performance fell below an objective standard of reasonableness based on consideration of all the circumstances and, if so, (2) that there is a reasonable probability that but for counsel's poor performance, the outcome of the proceedings would have been different. *State v.*

*McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If either element is not satisfied, the inquiry ends. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

A defendant alleging ineffective assistance of counsel bears the burden of showing deficient representation. *McFarland*, 127 Wn.2d at 335. In reviewing the record, there is a strong presumption that counsel's performance was reasonable. *Id.* "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). When counsel's conduct can be characterized as a legitimate trial strategy or tactic, their performance is not deficient. *Kyllo*, 166 Wn.2d at 863. "We can presume counsel did not request limiting instructions to avoid reemphasizing damaging evidence." *State v. Dow*, 162 Wn. App. 324, 335, 253 P.3d 476 (2011); *State v. Kloepper*, 179 Wn. App. 343, 356, 317 P.3d 1088 (2014) ("The decision to not object to or seek a cure for damaging evidence is a classic tactical decision.").

Even if we find that counsel's performance was deficient, a defendant must affirmatively prove prejudice. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). This requires more than simply showing that "the errors had some conceivable effect on the outcome." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A defendant demonstrates prejudice by showing that the

22

proceedings would have been different but for counsel's deficient representation.

*McFarland*, 127 Wn.2d at 337.

*Admission of Madison's Disclosures to Sara*

Prior to trial, defense counsel conceded that "the statement to [Sara] on

October 22nd, 2022 comes in in a very limited way . . . under the hue and cry."  RP at 43.

Defense counsel stated, "[a]s I understand that rule . . . the state is allowed to show that a

disclosure was made without stating what the disclosure was or even who the alleged

perpetrator was, under the hue and cry rule."  RP at 43.  The court responded that

Madison "gets to say, 'I—I—I spoke to my mom, then I didn't—didn't tell her the

second time, and then I did tell my—my aunt, and this is why I did.'"  RP at 45.  Defense

counsel agreed and added that Madison could say, "'Yeah, I went—Yeah, I talked to

the—I talked to the police,' too.  But what can't come in is the substance of any of those

prior statements."  RP at 45.

Then, at trial, Sara testified to the following:

[THE STATE:] Now, also in 2022, it would be—At some point in 2022 you had received some contact from [Ms. Graham] that she was concerned about visitations with the children and [Mr. Schilling] being with the children. Is that a fair statement?

[SARA:] Yes.

[THE STATE:] And, it would also be a fair statement that you—And so you acted upon that information during a—and I think it was a dentist visit that [Madison] had, you took the opportunity to,—oh, I'd describe it as prod her a little bit, but

23

you—would it be fair to say you asked [Madison] if she had an opinion about the children going back to [Mr. Schilling]. Is that a fair statement?

Well, tell me—tell me what you asked [Madison] in that car ride. Not what she said, but what did you say to her.

[SARA:] I actually just started out with letting her know that I'm always here for her and that I'm someone that she could always talk to. And then I asked her if she had any—concerns if the children did go back.

[THE STATE:] And—it would be fair to say that you received a—emotional response from her.

[SARA:] Very emotional.

[THE STATE:] Was—And when we say emotional, was she crying?

[SARA:] She was crying.

[THE STATE:] And was she sharing information that caused you concern?

[SARA:] At first she just cried for a while and I gave her a moment and—

[THE STATE:] Okay. And again don't—don't say what she said, but—so—so how long do you, after you've said that, she commences crying. How long a period of time do you think as you're driving.

[SARA:] Two minutes.

[THE STATE:] Okay. So after—after she's let that out, does she begin to talk to you?

[SARA:] Yes.

[THE STATE:] And does she begin to share information that causes you concern?

[SARA:] Definitely.

RP at 258-60. Madison also testified that she told Sara about the incidents because she was concerned about Mr. Schilling having contact with his children.

Mr. Schilling claims his counsel was ineffective for conceding that Madison's disclosure to Sara was admissible because the disclosure was untimely and therefore inadmissible. Under the original "hue and cry" rule or "fact of complaint" doctrine, "victims of violent crimes were expected to raise an immediate 'hue and cry' so their community could mount an immediate response." *State v. Martinez*, 196 Wn.2d 605, 609, 617, 476 P.3d 189 (2020). The general requirement to raise a hue and cry was eliminated in the 1700s but it widely persisted in cases concerning sexual violence. *Id.* Later, the "closely related 'fresh complaint' doctrine evolved as a response to the common law requirement of hue and cry." *Id.* at 610. The rule provides:

> [T]he *requirement* that the prosecution prove a sexual assault victim made a timely hue and cry was replaced with the rule that the State could introduce such evidence in its case in chief to negate any inference that because the victim had failed to tell anyone she had been sexually assaulted, her later claim could not be believed.

*Id.* Our Supreme Court held that though the doctrine had problematic roots, "it still plays an important function because many jurors still subscribe to the myth that 'real' victims report promptly." *Id.* Thus, "[i]n Washington, the State may present evidence that the victim reported the sexual violence to someone as part of its case in chief." *Id.* at 611. However, the evidence admissible under the doctrine is limited. *Id.* "Testimony under

25

the doctrine is not admissible for the truth of the matter asserted, only to demonstrate that the victim reported to someone," and witnesses may provide sufficient details to identify the nature of the offense but they may not testify to details such as the identity of the perpetrator. *Id.* Further, the court explained that the inquiry of timeliness does not turn on a predetermined amount of time. *Id.* at 614. Instead, the trial court is to examine the facts and surrounding circumstances and when the victim had an opportunity to complain. *Id.*

Here, when Madison disclosed to Amanda that Mr. Schilling was touching her inappropriately, nothing was done in response. Madison testified that had Sara not asked her how she felt about her siblings having contact with Mr. Schilling, she probably would not have disclosed the abuse. Mr. Schilling argues Madison could have made the disclosures to Sara at any point since she began living with her in 2019. Mr. Schilling contends the disclosures are untimely and inadmissible because they were made years later. However, the evidence demonstrates that Madison had made disclosures in the past and no action was taken. This would cause any person, especially a child, to be wary of repeating the disclosures. Further, there is no evidence that Madison had been previously asked about possible sexual abuse and failed to make a disclosure. Instead, the testimony demonstrates that Madison disclosed the sexual abuse by Mr. Schilling the first time she was asked about it. Consequently, under the rules outlined in *Martinez*, Madison's

26

complaint was timely and admissible, and counsel was not deficient for making that concession.

Moreover, even if Madison's disclosure to Sara was not admissible under the "hue and cry rule," it was still admissible for another purpose. To that point, *State v. Chenoweth*[8] is instructive. There, the defendant, Mr. Chenoweth, challenged the admission of testimony that C.C., the rape victim, had disclosed the rape to others a year after it occurred. 188 Wn. App. at 531. The State argued before the trial court that the disclosures were admissible under the fact of complaint exception to hearsay while Mr. Chenoweth argued because the disclosures were not timely made, they were inadmissible. *Id.* The trial court ruled the evidence of the disclosures was admissible to explain "how the allegations came to the attention of law enforcement." *Id.* At trial, multiple witnesses testified that C.C. had told them about the allegations. *Id.* at 532.

This court held that Mr. Chenoweth "is correct that the disclosures were inadmissible under the fact of complaint exception to the hearsay rule because they were not timely made." *Id.* However, we agreed that the trial court properly admitted the testimony "to show only how the allegations came to the attention of law enforcement." *Id.* at 533. We noted that "there was no testimony about the content of the disclosures, so

---

[8] 188 Wn. App. 521, 354 P.3d 13 (2015).

there was no 'truth' to be asserted other than the fact that C.C. disclosed the allegations."
*Id.* at 534-35.

Similarly, here, Madison's disclosure to Sara, made years after the fact, was admissible to show, at a minimum, how law enforcement got involved. Further, like in *Chenoweth*, neither Madison nor Sara testified to the specific details of Madison's disclosures. Thus, even if defense counsel incorrectly cited the hue and cry rule as the reason Madison's disclosure to Sara was admissible, counsel was not deficient for making the concession because the evidence was nevertheless admissible to demonstrate how the allegations came to the attention of law enforcement.

*Impeachment of Amanda*

While testifying for the State, Amanda stated she had not spoken to Mr. Schilling "in almost three years" due to a no-contact order.[9] RP at 487. Following her testimony, the State informed the court it would call Detective Shull to testify that Amanda did, in fact, have recent contact with Mr. Schilling. The State conceded that it would be "impeachment on a collateral matter" so it was "not sure it's relevant." RP at 495.

---

[9] Though Amanda testified for the State, her testimony was largely beneficial to Mr. Schilling as she stated Madison frequently had rashes on or near her vagina that required changing her clothes and bathing her and that it was common for Mr. Schilling to do this. Further, throughout her testimony, she indicated she did not believe Mr. Schilling sexually abused Madison. RP at 490 ("'Cause there's no way in heck [Mr. Schilling] would have touched [Madison].").

28

However, defense counsel stated, "it goes directly to her credibility. If she stands on— she's on the witness stand lying, that has everything to do with her credibility." RP at 495. Detective Shull then testified that, based on his examination of phone records, Amanda had had somewhat extensive contact with Mr. Schilling as recently as August 2023. On cross-examination, defense counsel elicited testimony from Detective Shull that none of the communications between the two indicated Mr. Schilling "was trying to coach her" for trial. RP at 508.

Mr. Schilling argues his attorney was ineffective for failing to object to the State's impeachment of Amanda on what he claims was a collateral matter. If a defendant bases their claim of ineffective assistance of counsel on their attorney's failure to object, "'the defendant must show that the objection would likely have succeeded.'" *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021) (quoting *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019)). "A few or even several failures to object are not usually cause for finding that an attorney's conduct has fallen below the objective standard of conduct." *Id.* at 250. "'Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal.'" *Id.* at 249 (quoting *Crow*, 8 Wn. App. 2d at 508). But, if defense counsel fails to object to inadmissible evidence, then they have performed deficiently and reversal is required so long as the defendant can show the result of trial would have been different without admission of the inadmissible evidence. *Id.*

29

Here, had defense counsel objected, the objection would have been successful since the State was seeking to impeach Amanda on a collateral matter. Generally, witnesses may not be impeached on collateral matters. *State v. Oswalt*, 62 Wn.2d 118, 120, 381 P.2d 617 (1963). "An issue is collateral if it is not admissible independently of the impeachment purpose." *State v. Fankhouser*, 133 Wn. App. 689, 693, 138 P.3d 140 (2006). Even prior conduct related to credibility may not be admissible unless relevant. *Harbottle v. Braun*, 10 Wn. App. 2d 374, 396, 447 P.3d 654 (2019). "Put another way, a witness may be impeached on only those facts directly admissible as relevant to the trial issue." *Fankhouser*, 133 Wn. App. at 693.

Whether Amanda lied about the last time she and Mr. Schilling had contact was not relevant to any issue at trial. Further, whether the two had recent contact was not admissible independent of the impeachment purpose. Thus, had defense counsel objected to the State's impeachment of Amanda, the objection would have been sustained.

Though defense counsel was deficient in failing to object, Mr. Schilling is unable to demonstrate the deficiency was prejudicial. First, Amanda's testimony was not particularly compelling. She testified that her kids were taken away from her in 2019, that she, at one point, had to do "[urinalysis] for the department," and she admitted she was largely uncooperative with the investigation. RP at 491. Secondly, though not testified about in depth, the jury was aware that CPS had been involved with the family prior to Sara adopting Madison. Thirdly, though Amanda's credibility was damaged by

30

Detective Shull's testimony, defense counsel was able to elicit testimony on cross-examination that Mr. Schilling and Amanda were in a prior long-term relationship and that nothing in the messages between them indicated Mr. Schilling was "coaching" her to "say anything in particular" at trial. RP at 508. Lastly, attacking Amanda's credibility may have benefited Mr. Schilling as Amanda affirmed Madison's testimony that Madison "came out of the room and said 'Daddy touched me.'" RP at 473.

Mr. Schilling cannot show the result of the trial would have been different but for his attorney's failure to object.

Finally, Mr. Schilling argues the cumulative effect of defense counsel's errors affected the outcome of the case. We disagree. There was no error related to trial counsel's concession that Madison's disclosure to Sara was admissible and counsel's deficiency related to the impeachment of Amanda was not prejudicial.

Mr. Schilling did not receive ineffective assistance from his trial counsel.

PROSECUTORIAL MISCONDUCT

Mr. Schilling argues the prosecutor committed prejudicial misconduct during voir dire, his opening statement, and his closing argument. We disagree the prosecutor engaged in misconduct during voir dire but agree with Mr. Schilling that the prosecutor committed prejudicial misconduct during his opening statement and closing argument.

Prosecutorial misconduct is grounds for reversal if "'the prosecuting attorney's conduct was both improper and prejudicial.'" *State v. Monday*, 171 Wn.2d 667, 675, 257

31

P.3d 551 (2011) (quoting *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009)).

"[T]he defendant bears the burden of proving that the prosecutor's conduct was both

improper and prejudicial." *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). A

prosecutor's argument "must be confined to the law stated in the trial court's

instructions." *State v. Walker*, 164 Wn. App. 724, 736, 265 P.3d 191 (2011). When a

prosecutor "mischaracterizes the law and there is a substantial likelihood that the

misstatement affected the jury verdict," the prosecutor's actions are considered improper.

*Id*.

When examining a prosecutor's alleged misconduct, the improper conduct is not

viewed in isolation. *Monday*, 171 Wn.2d at 675. Instead, it is viewed "in the full trial

context, including the evidence presented, 'the context of the total argument, the issues in

the case, the evidence addressed in the argument, and the instructions given to the jury.'"

*Id*. (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)). The purpose of

viewing the conduct in this light is to determine if the prosecutor's conduct was

prejudicial to the defendant, and it will only be viewed as prejudicial when there is a

substantial likelihood the misconduct affected the jury's verdict. *Id*. Therefore, when

viewing misconduct, the court should not focus on what was said or done but rather on

the effect that flowed from the misconduct. *Emery*, 174 Wn.2d at 762.

If a defendant fails to object at trial to the prosecutor's alleged misconduct, "then

the defendant is deemed to have waived any error, unless the prosecutor's misconduct

was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice." *Id*. at 760-61. "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id*. at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

### *Voir Dire*

Mr. Schilling asserts the prosecutor committed reversible misconduct during voir dire by asking impermissible "stakeout questions." We disagree.

CrR 6.4(b) governs voir dire in criminal cases:

**Voir Dire**. A voir dire examination shall be conducted for the purpose of discovering any basis for challenge for cause and for the purpose of gaining knowledge to enable an intelligent exercise of peremptory challenges. . . . The judge and counsel may then ask the prospective jurors questions touching their qualifications to serve as jurors in the case, subject to the supervision of the court as appropriate to the facts of the case.

"[V]oir dire questioning must be relevant to the issues in the prosecution." *In re Pers. Restraint of Skone*, 30 Wn. App. 2d 1, 28, 543 P.3d 842 (2024). "Voir dire is not without limitations," and the "trial court must preclude irrelevant questioning." *Id.* Voir dire should not be used to "educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury

33

in matters of law." *State v. Frederiksen*, 40 Wn. App. 749, 752, 700 P.2d 369 (1985)

(quoting *People v. Williams*, 29 Cal. 3d 392, 174 Cal. Rptr. 317, 325, 628 P.2d 869

(1981)). Such impermissible questioning during voir dire has been referred to in other

jurisdictions as "stakeout question[ing.]" *State v. Williams*, 427 P.3d 434, 442 (Utah Ct.

App. 2018).

During voir dire, the prosecutor asked the venire to consider the "type of evidence

that you might expect to see in this case?" RP at 150. Defense counsel objected, "I don't

believe it's appropriate to discuss evidence in voir dire." RP at 150. The court ruled it

would "allow him to ask if there are preconceived notions about the kind of evidence that

they'll be seeing." RP at 150. One venire member stated they expected to hear

testimony. The prosecutor next asked, "do you have any preconceived ideas about what

the state must provide as evidence in order for you to say, 'Okay, that's gonna be

sufficient.'" RP at 151. A few venire members responded that they expected to hear

testimony. One venire member noted that it "might be difficult to produce hard evidence.

That testimony would probably be primary. And that—you know, we're used to seeing

on TV the—you know, the DNA and that kind of stuff, and that just might not be—

presented." RP at 153. The prosecutor also asked if the State needed to produce a

particular type of evidence and how the venire members would consider witness

testimony.

34

Regarding child victims, the prosecutor asked, "do you have any sense why it might be difficult for children to report these crimes?" RP at 169. He also asked the venire "if a child had had difficulties in reporting something, is that the type of evidence that you might hold against them in trying to determine whether they're credible or not?" RP at 169. The prosecutor also asked whether a "delay in reporting" meant anything to jurors "in terms of credibility." RP at 170. Defense counsel again objected, arguing that the prosecutor was "attempting to sort of pre-qualify the jury and argue in terms of evidence in this case." RP at 170. The prosecutor responded, "I do have the right to inquire about preconceived notions about witness credibility and that's one of the central cruxes to what the jury's role is." RP at 170. The court instructed the prosecutor to "make that more clear that that's what you're doing." RP at 170.

The prosecutor concluded voir dire by asking:

But—Is there anyone sitting here in this room today that would expect that if a child is testifying about something, that they would remember every detail in complete accuracy from something that happened to them in the past. Anyone think that—is reasonable[?]

If you are talking about children and events that happened several years ago, is it reasonable, does anyone expect that if they had spoken to people over time about that, that each time they spoke about it, the versions would be exactly the same?

RP at 176.

Mr. Schilling claims the prosecutor "made clear that the case would only feature testimony, and he indoctrinated the panel to think it was sufficient and normal to hear

35

only testimony." Br. of Appellant at 57. We disagree. Here, the prosecutor did not tell the jury what evidence or what type of evidence would be admitted at trial. Instead, the prosecutor asked prospective jurors what evidence *they* thought they might see at trial. When many answered that they expected to hear testimony, the prosecutor inquired as to whether they had preconceived ideas as to whether that would be sufficient evidence to convict. At no point did the prosecutor tell the jury what evidence they would hear nor did he condition them to believe witness testimony was enough. The prosecutor asked questions of the venire to determine whether they had preconceived notions about witness credibility, child victims, witness testimony, or delays in reporting. Although the prosecutor's questions to the venire approached the limits of compelling the jurors to commit themselves to vote a particular way and indoctrinating the jury, Mr. Schilling has failed to demonstrate the prosecutor's conduct in asking these questions was both improper and prejudicial.

*Opening Statement and Closing Argument*

Mr. Schilling next argues the prosecutor committed prejudicial misconduct during his opening statement and closing argument. The State responds that Mr. Schilling waived the issue because he did not object to the prosecutor's statements below and the statements were not so flagrant and ill-intentioned so as to be incurable by an instruction to the jury.

During opening statement, the prosecutor said the case would "ultimately boil down to whether or not you believe what [Madison] . . . says happened." RP at 220. The prosecutor stated, "I think you will have the opportunity to watch her. You'll have the opportunity to listen to her. You'll have the opportunity to put what she says in context. And when you do that, *I think that you will find that what she is telling you is credible.*" RP at 220 (emphasis added). Defense counsel did not object to this statement.

Then, during closing, the prosecutor referenced Amanda's earlier impeachment, stating:

> Does [Amanda]—have any demonstrated problem with credibility. Well, I think she perjured herself on the stand, quite honestly, because she said, 'I have not had contact with Mr. Schilling for over three years.' Well, we put Det. Shull—the phone number she provided the day before. She'd been having contact with him on that phone back to August.
> . . . .
>
> Did [Amanda] commit perjury when she swore to tell the truth, the whole truth, nothing but the truth then got up there and lied? Yeah. That is definitely something you can consider about her credibility.

RP at 575-76. Defense counsel did not lodge an objection to this statement.

During summation, defense counsel generally argued Madison's testimony did not demonstrate Mr. Schilling committed the offenses beyond a reasonable doubt. Defense counsel argued:

> I'm not a Hollywood screenwriter, unlike Law and Order or Perry Mason back in the Stone Ages, the witness is never going to recount on the stand, and I'm never going to be able to show why a child lied if she lied intentionally.

37

> And I don't know that [Madison] lied intentionally, okay? I don't have to prove that she lied intentionally. They have to prove that she's telling the truth. And she does—her testimony has to be judged by the same standard of any other witness.

RP at 587.

Then, during the State's rebuttal to Mr. Schilling's closing argument, the

prosecutor began by stating:

> Wow. Wow. *I think maybe he could be a screenwriter, 'cause what he just told you was utter fiction*. Did you hear any of that from that witness stand?
> He starts, 'You have to hold every single word against this child,' and she has to be held to the same account, but then ends it with, 'I'm not a screenwriter for Hollywood, but let me plant another idea in your head that there's no evidence to support whatsoever, and I want you to consider that and come up with reasonable doubt based on nothing you heard in the courtroom, but what I just came up with for the next movie I'm writing for Hollywood.'

RP at 590-91 (emphasis added).  The prosecutor later referred to defense counsel's

argument as "this latest Hollywood rendition."  RP at 593.  Finally, the prosecutor

concluded his rebuttal argument by stating:

> And you judge the credibility of the witnesses. And when you do that—and ignore the last—I think I had like a page and a half of notes on this *fantastic story*—ignore that altogether, 'cause there was no testimony along that—And fill out those forms guilty, all four.

RP at 594 (emphasis added).  Mr. Schilling did not object during the State's

rebuttal argument.

Mr. Schilling argues the prosecutor committed flagrant and ill-intentioned misconduct when he (1) vouched for Madison's credibility during opening, (2) stated Amanda committed perjury during closing, and (3) denigrated defense counsel by calling him a "Hollywood screenwriter" during rebuttal. RP at 587. We agree that, collectively, the prosecutor's statements amounted to flagrant and ill-intentioned misconduct that could not have been cured by an instruction from the court to the jury.

As to whether the prosecutor inappropriately vouched for Madison's credibility during opening, the State correctly concedes that the prosecutor's statement was improper. However, it argues the prosecutor's comment was not so flagrant and ill-intentioned that a curative instruction would not have obviated the resulting prejudice.

"It is misconduct for a prosecutor to state a personal belief as to the credibility of a witness." *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008). Further, we have previously cautioned that the use of the phrase "I think" is improper and prosecutors should refrain from using it. *State v. Jackson*, 150 Wn. App. 877, 889, 209 P.3d 553 (2009). The prosecutor's statement during opening that "I think that you will find that what [Madison] is telling you is credible" was improper. RP at 220.

Mr. Schilling next asserts the prosecutor's statements, "Well, I think she perjured herself on the stand, quite honestly" and "Did [Amanda] commit perjury when she swore to tell the truth, the whole truth, nothing but the truth then got up there and lied? Yeah" were improper, flagrant, and ill-intentioned. RP at 575-76. The State concedes that the

prosecutor's statements were improper but argues they were not flagrant and ill-intentioned.

In *State v. Wheless*, the prosecutor argued that, in order to find the defendant not guilty, one would have to conclude that the police lied. 103 Wn. App. 749, 758, 14 P.3d 184 (2000). There, we held the statement was improper but not so flagrant and ill-intentioned that a curative instruction would not have obviated the prejudice. *Id.* On the other hand, in *State v. Reed*, our Supreme Court found reversible misconduct where the prosecutor called the defendant "a liar no less than four times" and asserted his personal opinion of the credibility of a witness and the guilt of the accused. 102 Wn.2d 140, 145, 684 P.2d 699 (1984); *State v. Lindsay*, 180 Wn.2d 423, 438, 326 P.3d 125 (2014) (finding reversible misconduct, in part, because the prosecutor stated in closing that the defendant "[sat] here and lied.").

Here, the prosecutor again injected his personal belief into his argument when he stated, "*I think* [Amanda] perjured herself on the stand" and when he repeated this sentiment shortly thereafter. RP at 575 (emphasis added). Even more troubling, the prosecutor not only implied Amanda was a liar, but offensively accused her of committing perjury. Moreover, as explained above, the impeachment of Amanda on a collateral matter, which gave rise to the prosecutor's argument that she committed perjury, was improper. Thus, the prosecutor's statements that he believed Amanda committed perjury was improper, flagrant, and ill-intentioned.

40

Finally, Mr. Schilling argues the prosecutor improperly denigrated defense counsel by stating, "he could be a screenwriter." RP at 590. The State responds that the prosecutor did not denigrate defense counsel.

"It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity." *Thorgerson*, 172 Wn.2d at 451. In *Thorgerson*, our Supreme Court found flagrant and ill-intentioned misconduct where the prosecutor referred to defense counsel's presentation of his case as "bogus" and involving "sleight of hand." *Id.* at 451-52. The court noted that it was particularly troubling that the prosecutor's "sleight of hand" argument was planned in advance. *Id.* at 452.

In contrast, here, the prosecutor's Hollywood screenwriter argument was not planned in advance and was responsive to defense counsel's own closing argument. However, the prosecutor did impugn defense counsel's integrity by calling his argument "utter fiction" and a "fantastic story" and, even if not planned in advance, by twice referring to him as a Hollywood "screenwriter." RP at 590, 594; *Thorgerson*, 172 Wn.2d at 451-52. The prosecutor's remarks about defense counsel during its rebuttal argument were improper, flagrant, and ill-intentioned.

In the absence of an objection, these statements taken in isolation may not amount to prejudicial flagrant and ill-intentioned misconduct. However, when viewed collectively, the misconduct was sufficiently offensive to rise to the level of flagrant and ill-intentioned misconduct warranting reversal.

Here, the prosecutor's improper comments began during its opening statement and persisted through its rebuttal to Mr. Schilling's summation. The prosecutor's arguments were likely to have had a significant persuasive impact on the jury as the comments were largely derived from his personal opinion and, as Mr. Schilling highlights, the prosecutor was the elected prosecuting attorney for the county. Jurors were likely familiar with him, thus giving him an extra aura of credibility.

Moreover, Mr. Schilling's trial was based solely on witness testimony and thus the credibility of each witness was crucial. The prosecutor's personal vouching for Madison's credibility and labeling Amanda a perjurer, who was a favorable witness for Mr. Schilling, bolstered Madison's truthfulness while ruining Amanda's veracity. Notably, the jury was unable to reach a unanimous verdict on the rape of a child in the first degree charge.

The prosecutor's personal beliefs about the credibility of witnesses, coupled with the prosecutor's denigration of defense counsel, create a substantial likelihood that the improper comments affected the jury's verdicts. Because of the pervasiveness of the prosecutor's improper arguments, a curative instruction from the court would not have obviated the resulting prejudice.

The prosecutor committed prejudicial misconduct during trial sufficient to warrant reversal.

CUMULATIVE ERROR

Mr. Schilling argues the cumulative impact of the errors deprived him of a fair trial. "Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *Emery*, 174 Wn.2d at 766. Here, the errors consisted of inadmissible hearsay and the prosecutor's misconduct. The cumulative effect of these errors rendered the trial fundamentally unfair.

SUFFICIENCY OF EVIDENCE

Mr. Schilling argues the State presented insufficient evidence to convict him of indecent exposure. We agree.

The sufficiency of the evidence is a question of law this court reviews de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). In a sufficiency of the evidence challenge, "we review the evidence in the light most favorable to the State" to determine whether any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Varga*, 151 Wn.2d 179, 201, 86 P.3d 139 (2004). "A claim of insufficiency admits the truth of the State's evidence and all inferences that can reasonably be drawn from it." *State v. DeVries*, 149 Wn.2d 842, 849, 72 P.3d 748 (2003). "[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

43

Mr. Schilling asserts the State failed to prove he exhibited his genitals for lascivious reasons. The State responds that there was sufficient evidence to convict Mr. Schilling of indecent exposure.

RCW 9A.88.010(1) states:

> A person is guilty of indecent exposure if he or she intentionally makes any open and obscene exposure of his or her person or the person of another knowing that such conduct is likely to cause reasonable affront or alarm. The act of breastfeeding or expressing breast milk is not indecent exposure.

The jury was instructed consistent with RCW 9A.88.010(1).

In *State v. Thompson*, we recently noted that "[t]he phrase 'obscene exposure,'. . . is a legal term of art; it is the 'exhibition' of something customarily kept private, i.e., genitals, which are exhibited for lascivious reasons." 28 Wn. App. 2d 1, 11, 536 P.3d 682 (2023), *review denied*, 2 Wn.3d 1021, 542 P.3d 582 (2024). We reiterated that "our courts have defined the phrase 'obscene exposure' not as nudity but as a kind of wrongful exhibition." *Id.* Thus, "the question is whether our common shared sense of societal decency would judge a given lascivious exhibition of a sexual organ as indecent or improper." *Id.* at 11-12.

Here, Madison testified that Mr. Schilling followed her into the restroom at the 18th Street Deli. She testified it was not customary for Mr. Schilling to enter the restroom with her. While in the restroom, Madison testified Mr. Schilling put "his hand in [her] pants." RP at 406. She told Mr. Schilling to "[s]top," and he did. RP at 407.

44

She then testified that Mr. Schilling "went to the bathroom" in front of her. RP at 408. The State asked Madison, "And when you say in front of you, you mean you're there and seeing him do this?" RP at 408. Madison responded, "Yeah. Yeah." RP at 408.

Mr. Schilling testified that he followed Madison into the restroom at the 18th Street Deli because he "had to use the bathroom" and "didn't want to leave her outside." RP at 520. He testified she was between 10 and 12 years old when this incident occurred. Mr. Schilling also testified he always sits down when relieving himself.

In reviewing this evidence in a light most favorable to the State, insufficient evidence was admitted to prove Mr. Schilling committed indecent exposure. Based on the testimony, it was unclear whether Mr. Schilling's genitals were wrongfully exhibited when he urinated. Further, even if Mr. Schilling's genitals were wrongfully exhibited, the State failed to prove he exposed them for "lascivious reasons." The State also failed to present any evidence that Mr. Schilling's conduct in the restroom was likely to cause Madison reasonable affront or alarm. Thus, in viewing the evidence in a light most favorable to the State, the evidence was insufficient for a rational trier of fact to find beyond a reasonable doubt that Mr. Schilling committed the crime of indecent exposure.

We reverse Mr. Schilling's conviction of indecent exposure and dismiss with prejudice.

No. 40056-5-III
*State v. Schilling*

CONCLUSION

We reverse both child molestation in the first degree convictions without prejudice and remand for a new trial, reverse the indecent exposure conviction and dismiss with prejudice, and decline to address the challenged conditions of community custody.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Murphy, M.

_____
Staab, A.C.J.

46